## SECRETARY OF STATE *v.* McLEAN, ET AL.

[No. 368, September Term, 1967.]

*Decided per curiam March 7, 1968.*

*Opinion filed April 3, 1968.*

The cause was argued before HAMMOND, C. J., and HORNEY, BARNES, FINAN and SINGLEY, JJ.

*Lewis A. Noonberg, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellant.

*Thomas F. Cadwalder* and *John Brockenbrough Fox,* with whom was *George Washington Williams* on the brief, for appellees.

HAMMOND, C. J., delivered the opinion of the Court.

After argument, we affirmed by per curiam order Judge Dyer's issuance of the writ of mandamus requiring the Secretary of State to refer to the vote of the people, pursuant to the provisions of Art. XVI of the Constitution of Maryland, Ch. 385 of the Laws of 1967, sometimes referred to as the Open Housing Bill. Our reasons for so doing follow.

Article XVI of the Constitution reserves to the people the power of referendum, the right to reject or approve an act of the General Assembly. Section 1 (b) reads as follows:

"(b) The provisions of this Article shall be self-executing; provided that additional legislation in furtherance thereof and not in conflict therewith may be enacted."

Section 2 provides that if a referendum petition is filed with the Secretary of State, "the same shall be referred" by him to a vote of the people at the next ensuing election. Section 3 deals with the number of signers necessary for a referendum petition, and for extending the time for filing the petition for thirty days if more than one-half the requisite number of signatures required are filed before the first day of June. Section 4 reads as follows:

"A petition may consist of several papers, but each paper shall contain the full text of the Act or part of Act petitioned upon; and there shall be attached to each such paper an affidavit of the person procuring the signatures thereon that of the said person's own personal knowledge every signature thereon is genuine and bona fide, and that the signers are registered voters of the State of Maryland, and of the City of Baltimore, or County, as the case may be, as set opposite their names, and no other verification shall be required."

The statutory provisions in furtherance of the constitutional right of referendum include § 169C of Art. 33 of the Code (1967 Repl. Vol.), now Art. 33, § 23-6 (a) (Supp. 1967), reading as follows:

"(a) *Filing and certification.*—At the time of filing with the Secretary of State a petition (including an associated or related set of petitions) under the provisions of Article 16 of the Constitution, the person, persons, association, or corporation which files the petition shall file with it a statement showing the contributions and expenditures for the petition. This shall be certified by the person, persons, association, or corporation which files the petition, giving (1) the name and post-office address of every contributor to the expense of the petition, and the amount paid by each; and (2) the name and post-office address of every person to whom, and for what service, any money was paid or promised on account of the petition or which is owed to be paid.

"(b) *Effect of failure to file.*—If such a certified statetment is not filed with the petition, the Secretary of State shall treat the petition as invalid and shall not certify the question of the referendum to the several boards of supervisors of election."

Following the passage of the Open Housing Bill two groups of opponents, the Maryland Petition Committee, Inc. (Maryland) and the Maryland Taxpayers Association (Taxpayers) began gathering signatures of persons who desired a referendum on the Bill. Maryland gathered some 2,000 valid and effective signatures and Taxpayers some 18,000. The number of signers required under Sec. 3 of Art. XVI was "three per centum of the qualified voters of the State of Maryland, calculated upon the whole number of votes cast therein for Governor of the last preceding Gubernatorial election * * *," or 27,593, it being sufficient if more than half were filed before the first of June and the remainder before June 30.

Representatives of Maryland and Taxpayers took the 20,000 signatures to the office of the Secretary of State on the night of May 31 with a letter of transmittal of the same date on the letterhead of both, which said in essential part:

"[Maryland and Taxpayers], acting jointly, submit the signatures of twenty thousand (20,000) registered

voters * * * who * * * respectfully petition * * * that
* * * Ch. 385 * * * be referred to a vote of the people.

"We enclose separate financial reports for each of
the above mentioned organizations * * *."

Apparently the Secretary had been advised that 2,000 signatures had been gathered and submitted by Maryland and 18,000 by Taxpayers. He referred to the Attorney General the transmittal letter, a copy of one of the separate signature sheets which together made up the petition, and copies of the financial statements. The Attorney General on June 9 advised the Secretary that the signature sheet and Taxpayers' financial statement were in order, but that Maryland's financial statement was invalid and that "the petitions to which this financial statement applies may not be accepted by you."

The Attorney General also wrote the Secretary that:

"You advise us, however, that all of the papers were submitted to you at one time in boxes and that it is not possible for you to determine which papers were submitted by the Maryland Petition Committee. Consequently, we must advise you that unless some court of competent jurisdiction authorizes some type of allocation, all of these papers must be considered ineffective and invalid due to the failure of the Petition Committee to comply with Section 169C of Article 33."

In the meanwhile the Secretary had been verifying the signature sheets, and because a box containing 5,000 signatures had become misplaced in his office, he concluded that but 15,000 signatures had been filed by June 1. Knowing that 2,000 of these had been gathered and filed by Maryland and having been advised by the Attorney General that the financial report filed by Maryland was deficient under the law and thereby invalidated the 2,000 Maryland signatures, the Secretary concluded that there had been timely filed less than 13,000 signatures, although in order to comply with the Constitution over 13,796 signatures were requisite. Accordingly, he advised Maryland and Taxpayers that Ch. 385 would not be referred.

One of Taxpayers' signature gatherers promptly convinced the Secretary that he had overlooked 5,000 signatures which

had been gathered and submitted by Taxpayers with the rest on May 31 by finding them in a box in a cabinet in the Secretary's office. A meeting was held at the Secretary's office on June 21 attended by representatives of Maryland and Taxpayers, who tried to convince the Secretary that the claimed defects in Maryland's financial statement were trivial and picayune. Maryland's representative Albritton wanted to reveal to the Secretary, in response to questions by the Secretary, that the 2,000 signatures gathered and filed by Maryland could easily and definitely be identified and separated from the others, thus leaving 18,000 valid signatures covered by a valid financial statement on file by May 31, but the representatives of Taxpayers persuaded him to be silent and told the Secretary that Maryland's and Taxpayers' signatures should be considered together, feeling that they would need Maryland's 2,000 signatures to help make up the approximately 8,000 signatures they would need to reach 28,000 by June 30. Maryland's treasurer Shives filed a corrected (and adequate) financial statement on June 23. On June 24, Taxpayers' secretary wrote the Secretary of State, noting that Maryland had filed the corrected statement and saying:

> "We sincerely hope that your office will find the corrected financial statement all in order and will consider all the petitions valid, thus making any court action on our part unnecessary. We would like you to know that if a court ruling should be such that in order to save the drive to put this law to referendum it is necessary to consider separately the petitions submitted by each of our two organizations, this can be done."

Albritton said that on one occasion between June 21 and August 1 he told the Secretary that Maryland's petition could be identified and distinguished from Taxpayers'; the Secretary agrees that he did so advice him.

On June 30, Maryland and Taxpayers filed some 17,000 additional valid and effective signatures with the Secretary and each filed an adequate financial statement.

At the hearing on the petition for mandamus brought by several signers to compel the Secretary to refer Ch. 385, repre-

sentatives of Maryland and Taxpayers proved that Taxpayers had filed 18,000 admittedly valid signatures by May 31 and Maryland 2,000 signatures, and that but three persons had gathered Maryland's 2,000 signatures and they could identify them. Albritton testified that on each sheet used by Maryland the number of names was noted in the righthand corner and that Taxpayers' sheets were not so marked. He said that at the meeting with the Secretary on June 21 he and Maryland's lawyer were:

"going to tell them that we could identify our two thousand and we wanted them to take them out * * * throw them out * * *. Our lawyer wasn't permitted to come into the room [by Taxpayers' representatives]. We were prepared at that time to tell them that we could identify our two thousand, because there was only three of us collected * * * the two thousand and it would be easy enough to identify them, even if they hadn't been marked, but they were marked on the corner. * * * but I saw I was overruled—overruled on the thing [by Taxpayers' officers present]."

A Taxpayers' representative testified that although it knew that the June 21 meeting was to determine whether Maryland's 2,000 signatures could be separated from the rest:

"we had already decided that we were going to take the stand that it was going to be a joint submission.[1] What I was trying to point out, however, is that the Attorney General, as you know, made the ruling that the signatures were invalid because of this faulty financial statement. * * * In other words, we did not know that if we had, in fact, said that the two thousand signatures that Mr. Albritton had submitted—

---

1. The witness said: "This, remember, was the 21st of June and we had some ten days to complete our petition drive. And believe me, at that point, we were in hot water. We had considerably less than the required number, so we felt at that time that we must take—we must declare and use this two thousand signatures, because, in fact, if we didn't have the required number at the end of the drive, then whether or not the financial report was valid would have been purely academic."

if we had, in fact, said 'We can pick those out and they are his, and there are our eighteen thousand.' We did not know then that that would have validated our petition, Your Honor. That's my point."

Judge Dyer denied a defendant's motion for a directed verdict at the end of the plaintiffs' case, finding that the plaintiffs had shown that the "number of signatures" attributable to Maryland and Taxpayers, respectively, "although not made known to the Secretary of State at the time submitted, has been made here in Court," but at the conclusion of the case rested his decision on the ground that:

> "the Maryland Petition Committee, Inc. made a good faith and bona fide effort to comply with Section 169C which, while not strict or literal compliance on May 31, 1967, was a sufficient degree of compliance to merit an opportunity to amend to the strict requirement of the Section. The amendment of June 30, 1967, met this latter standard. The petition for a Writ of Mandamus, therefore, is granted."

We do not think it necessary to rule on this ground of decision. The Secretary did not controvert the facts as to sufficient compliance with Art. XVI of the Constitution and with § 169C of Art. 33, proven by the plaintiffs, namely that 18,000 valid signatures covered by a valid financial statement had been filed by June 1, and 17,000 more filed by June 30. He merely showed that he was told by Taxpayers and Maryland that they did not want to separate their signatures and that although later advised that Maryland's could be identified was never told how, and therefore followed the ruling of the Attorney General.

We think it was abundantly and clearly proven that approximately 18,000 valid signatures related to and covered by a valid financial statement were filed on May 31. Only approximately 13,800 were needed by June 1 (there is no dispute that enough additional signatures, duly covered by valid financial statements, were filed by June 30). The persons whose signatures were legally and constitutionally presented and filed with the Secre-

tary are entitled to have Ch. 385 referred under Art. XVI, and the Circuit Court for Harford County did not err in ordering that it be referred.